IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DRUPATTY JAIPERSAUD,　　　　)
　　　　Plaintiff,　　　　　　　　)　　　　　　Civil Action No.
　　　　　　　　　　　　　　　　)　　　　　　10-CV-455-JEC
　　　　vs.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
TIMOTHY R. ASHLEY,　　　　　　)
　　　　Defendant.　　　　　　　)

## PLAINTIFF'S MEMORADUM OF LAW IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT TIMOTHY ASHLEY

Plaintiff submits this brief in support of her motion for partial summary judgment on liability as to her federal, Fourth Amendment claim, against Timothy Ashley.

## I.

## INTRODUCTION

This case involves a so-called "contempt of cop" arrest.[1]  The plaintiff, Ms. Drupatty Jaipersaud, is a native of Guyana who first arrived the United States in 1988. Since that time, Ms. Jaipersaud has worked her way from a hotel clerk and medical technician to entrepreneur and sole owner of a Chevron gas station in Lawrenceville. On September 24, 2008, Detective Timothy Ashley, the defendant in this case, arrested Ms. Jaipersaud for "disorderly conduct" in her own place of business after Ms. Jaipersaud sought the help of the police to quell a customer disturbance.  By Ashley's

---

[1] *See generally* Christy E. Lopez, *Disorderly (mis)Conduct: The Problem with "Contempt of Cop" Arrests*, Am. Const. Soc'y Issue Brief, June 2010, attached hereto as Ex. A.

1

own admission, this arrest had nothing to do with what had transpired between Ms. Jaipersaud and the unruly customers earlier that day. Instead, Ashley arrested Ms. Jaipersaud because she was unable to abide by his impossible investigatory demand that she furnish the immediate presence of her son at the store to assist in operating a video surveillance system when her son was then attending class in Clayton County.

The events leading up to Ms. Jaipersaid's arrest are clearly documented in the record, which includes a video surveillance tape and a certified transcript from a prior trial on this incident, and are in all material respects undisputed. The record indisputably and convincingly establishes that Ms. Jaipersaud and her husband, Arnold Jaipersaud, who was also working at the gas station on September 24th, did all they could to accommodate and assist Ashley in his investigation, including his efforts to playback the surveillance video.

The rationale that Ashley has since provided to justify his "disorderly conduct" arrest of Ms. Jaipersaud – namely, that Ms. Jaipersaud somehow refused to cooperate with the police investigation – finds absolutely no support in the record and, as a consequence, cannot be used to defeat Ms. Jaipersaud's motion for partial summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"). Accordingly, this Court

should grant plaintiff's motion for partial summary judgment on liability as to her federal, Fourth Amendment claim against Ashley.

## II.

## STATEMENT OF FACTS

On September 24, 2008, Plaintiff, Drupatty Jaipersaud, was working her usual 18-hour day at a Chevron gas station in Lawrenceville, Gwinnett County.  (Jaipersaud Dep. 11; D. Jaipersaud Decl. ¶¶ 13, 17.)  Ms. Jaipersaud purchased the gas station in December 2007 after working in a number of other fields including medicine and hospitality.  (Jaipersaud Dep. 10; D. Jaipersaud Decl. ¶¶ 5-6, 9, 12.)

Around 1:35 p.m. on September 24, 2008, Ms. Jaipersaud and her husband, Arnold Jaipersaud, who was also working at the gas station that day, had an encounter with a disgruntled customer, Mr. Leon Noble.  (Jaipersaud Dep. 24; A. Jaipersaud Decl. ¶¶ 5-6.)  Mr. Noble was upset because he was unable to purchase gas from one of the gas pumps.  (Jaipersaud Dep. 24; A. Jaipersaud Decl. ¶ 5-6.)  Ms. Jaipersaud explained to Mr. Noble that she had no gas for sale because of a region wide gas shortage. (Jaipersaud Dep. 24-25; A Jaipersaud Decl. ¶ 6.)  Mr. Noble then accused Ms. Jaipersaud of being racist and called her a "coolie."  (Jaipersaud Dep. 24; Ashley Dep. 51.)   An argument ensued between the Jaipersauds and Mr. Noble.  (Jaipersaud Dep. 24-25; A. Jaipersaud Decl. ¶¶ 5-8.)  While the record is conflicted as to who had instigated the dispute – the Jaipersauds or Mr. Noble – it is indisputable that Mr. Noble

thereafter escalated the confrontation. This is documented by the store's surveillance video. (SMF Attachment "B" [9/24/2008 video at 3:35 to 7:31 [*front view*: 12:37:13 to 12:45:02].).[2]

At some point, Mr. Noble's wife, Nathalie Noble, ran into the store and began yelling at Mr. and Ms. Jaiperesaud. (Jaipersaud Dep. 27:23-28:10.) The video clearly documents the increasingly threatening and dictatorial behavior of the Nobles, as both Mr. and Ms. Jaipersaud pled for them to leave the store. (SMF Attachment "B" [9/24/2008 video at 3:35 to 7:31 [*front view*: 12:37:13 to 12:45:02].) Concerned for her own safety and seeking to quell a disturbance at her own place of business, Ms. Jaipersaud retreated behind the cash register area and called 911. (Ashley Dep. 102; D. Jaipersaud Decl. ¶¶ 40, 42.) Ms. Jaipersaud remained inside the cash register area until the police arrived. (D. Jaipersaud Decl. ¶¶ 40, 42.)

At approximately 1:45 p.m., the first two officers from the Lawrenceville Police Department arrived at the gas station in response to Ms. Jaipersaud's 911 call, one of whom was Timothy Ashley, the defendant in this case. (Ashley Dep. 49, 127.) The Nobles were standing outside of Ms. Jaipersaud's store at this time. (*Id.* at 49.) Both Ashley and the other responding officer, Ron Cone, spoke first to the Nobles. (*Id.* at 49-50.) Mr. Noble complained to the officers that Ms. Jaipersaud had hit him on the arm

---

[2] Unless otherwise indicated, all exhibits referenced in this memorandum of law are also attached to Plaintiff's Statement of Material Facts As to Which There is No Genuine Issue to be Tried and therefore bear the same "SMF Attachment" citation format and attachment letter as that contained in Plaintiff's Statement of Material Facts.

and had called him a "nigger" during their prior encounter.  (*Id.* at 50; SMF Attachment "C" [Ashley Summary Report, Jaipersaud – 69].)  Ms. Jaipersaud never called Mr. Noble a "nigger," however.  (Ashley Dep. 81:10-11; D. Jaipersaud Decl. ¶ 43.) Moreover, the battery claim made by Mr. Noble was a complete fabrication as the store's surveillance video did not document one instance of Ms. Jaipersaud even touching Mr. Noble.  (SMF Attachment "B" [9/24/2008 video at 3:35 to 7:31 [*front view*: 12:37:13 to 12:45:02].)

When Cone and Ashley entered Ms. Jaipersaud's store to continue their investigation, Ms. Jaipersaud told them that Mr. Noble was the one who had started the altercation and that she had never touched or hit Mr. Noble.  (Ashley Dep. 51, 83; D. Jaipersaud Decl. ¶ 50.)  Ms. Jaipersaud then suggested to Ashley that he take a look at the surveillance video recording from earlier in the day which would confirm her story that she never hit Mr. Noble.  (Jaipersaud Dep. 46:16; A Jaipersaud Decl. ¶ 19.)

Even though Ms. Jaipersaud and her husband knew nothing about operating the surveillance system, they still tried to help Ashley and the other officers in playing back the video.  Ms. Jaipersaud gave Ashely the system's operating manual and her log-in password (Jaipersaud Dep. 39; D. Jaipersaud Decl. ¶ 52; A. Jaipersaud Decl. ¶ 20) and Mr. Jaipersaud offered to assist the officers in figuring out how to play back the video (Ashley Dep. 169:2-6; A. Jaipersaud Decl. ¶ 22).  Ms. Jaipersaud also allowed the officers free and unlimited access to the back room in which the surveillance system

was stored.  (Ashley Dep. 51; Jaipersaud Dep. 38-39.)  In short, Ms. Jaipersaud never

prevented Ashley or any other officer from accessing the video surveillance system.  As

Ashley testified during his deposition:

> Q: Did either Ms. Jaipersaud or her husband at any point during your
> investigation prevent you from accessing the machine?
> A: Accessing the –
> Q: The video machine.
> A: No, no, absolutely not.  No, she allowed us to go back and look at it.

(Ashley Dep. 165:1-7.)

After spending about six minutes[3] trying to play back the surveillance video with

no success, Defendant Ashley grew frustrated and upset.  (Jaipersaud Dep. 38.)  He

asked Ms. Jaipersaud what she usually did to operate the machine.  (Ashley Dep. 52.)

Ms. Jaipersaud responded that she generally asked her son to help with such a task.  (*Id.*;

Jaipersaud Dep. 39.)

Defendant Ashley directed Ms. Jaipersaud to get her son to the store immediately.

(Jaipersaud Dep. 36; D. Jaipersaud Decl. ¶ 58; A. Jaipersaud Decl. ¶¶ 23-24; State v.

Jaipersaud, Trial Tr. 62:18-63:13.)[4]  Ms. Jaipersaud informed Ashley that her son was,

at that time, attending class at Clayton State University, and that he did not usually

---

[3] This six-minute period begins from the time Ashley and Officer Wiernik are seen in the "front view"
of the surveillance video walking to and remaining inside the rear cash register area to when Ashle is
seen pulling Ms. Jaipersaud out of the store by her arm.  (SMF Attachment "B" [9/24/2008 video at
11:21 to 13:50 [*front view* at 12:52:40 to 12:59:10], 33:07 to 34:56 [*back view* at 12:53:28 to
12:59:06]].)

[4] References to "State v. Jaipersaud, Trial Tr." pertain to the testimony of Timothy Ashley given in
Ms. Jaipersaud's trial and acquittal on the charges stemming from the incident at issue.  A certified
copy of the complete trial transcript is attached as SMF Attachment "F" to Plaintiff's Statement of
Material Facts.

answer his phone while school was in session.  She also told Ashley that the university was over an hour away from the store, a fact that Ashley knew himself, having been a Clayton County police officer at one time.  (Ashley Dep. 75, 93:19-22, 120, 168; Jaipersaud Dep. 39; A. Jaipersaud Decl. ¶ 24.)

Still, Ashley demanded that Ms. Jaipersaud furnish the immediate presence of her son.  (Jaipersaud Dep. 39; D. Jaipersaud Decl. ¶ 59; A. Jaipersaud ¶ 24; State v. Jaipersaud, Trial Tr. 62:18-63:13.)  At one point, Ms. Jaipersaud even tried to call her son in Ashley's presence, but could not reach him.  (Ashley Dep 74; Jaipersaud Dep. 39; *State v. Jaipersaud*, Trial Tr. 62:18-63:13.)  Unsatisfied and upset, Ashley threatened to arrest Ms. Jaipersaud if she could not produce her son immediately.  (Jaipersaud Dep. 40.)  In a bout of frustration, Ms. Jaipersaud complained to Ashley that he was making unreasonable demands on her.  (D. Jaipersaud Decl. ¶ 65.)  She also asked Ashley what he would arrest her for to which he replied for not cooperating.  (*Id.* ¶ 64; Jaipersaud Dep. 40.)  At that point, Ashley grabbed Ms. Jaipersaud's arm, pulled her out of the store, and arrested her.  (Jaipersaud Dep. 40; Ashley Dep. 128; A. Jaipersaud Decl. ¶ 26.)

### III.

### ARGUMENT AND CITATIONS OF AUTHORITY

A.   THE UNDISPUTED FACTS ESTABLISH THAT DEFENDANT ASHLEY ARRESTED PLAINTIFF JAIPERSAUD WITHOUT PROBABLE CAUSE

1.   Legal Standard

It is well established that "[a] warrantless arrest without probable case violates the Constitution and provides a basis for a section 1983 claim." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004) (citing *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990)). "Probable cause to arrest exists when an arrest is objectively reasonable based on the totality of the circumstances." *Id.* (citing *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998)). This, in turn, requires that " 'law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.' " *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) (citation omitted). Moreover, "[w]hether an arresting officer possesses probable cause … naturally depends on the elements of the alleged crime and the operative fact pattern." *Id.* (citing *Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004)). The Eleventh Circuit Court of Appeals has described this probable cause standard as "practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances." *Id.* (citing *Maryland v. Pringle*, 540 U.S. 366, 370 (2003)).

2.      Probable Cause for "Disorderly Conduct" and Similar Offenses

Plaintiff is entitled to summary judgment on her federal claim against defendant Ashley under this Circuit's probable cause standard. The record is undisputed that Ashley arrested Ms. Jaipersaud under subsections (c) and (k) of the City of Lawrenceville disorderly conduct ordinance. (Ashley Dep. 61-62, 89, 124-25, 139, 144-

45; SMF Attachment "H" [Citation].)[5]  Ashley also testified that, with all the facts

known to him at the time of the incident, he knew of no crime, other than disorderly

conduct, for which he could have arrested Ms. Jaipersaud.  (Ashley Dep. 165:17-25.)  In

this factual scenario, then, the only offenses that could conceivably be proffered by

defendant Ashley to justify his arrest of Ms. Jaipersaud are disorderly conduct and,

perhaps, misdemeanor obstruction.  *See Skop*, 485 F.3d at 1137-38.

       3.    <u>Ashley Lacked Probable Cause to Arrest Ms. Jaipersaud for Disorderly</u>
<u>Conduct Under Georgia State Law</u>

Georgia's disorderly conduct statute contains four separate provisions, only one

of which would be relevant under the "operative fact pattern."  *Id.* at 1137 (citation

omitted).  This is the same provision that the State cited in Count One of its accusation

against Ms. Jaipersaud in the underlying criminal matter (*see* SMF Attachment "I"

[Accusation]) and provides, "(a) A person commits the offense of disorderly conduct

---

[5] Lawrenceville's disorderly conduct ordinance provides, in pertinent part:

> It shall be unlawful for any person or persons to create any disturbance that is contrary
> to the peace and tranquility enjoyed by the people, or interfere with the lawful
> movement of vehicular pedestrian traffic; or ignore, interefere or disobey a lawful
> command from a law enforcement officer in the lawful performance of his duties; or
> engage in any of the following acts: […] (c) Any person who shall endanger the lawful
> pursuits of another by acts of violence, threats of violence or abusive conduct; or […]
> (k) Any person who shall without provocation, use to or of another, in his or her
> presence "fighting words" that are opprobrious or abusive words which by their very
> utterance tend to incite an immediate breach of the peace or such words, which as a
> matter of common knowledge under ordinary circumstances will, when used to or of
> another person in his or her presence, naturally tend to provoke violent resentment.

City of Lawrenceville General Code of Ordinances, Ch. 31-101.2 (c) & (k) (2005), *available at*
http://www.lawrencevillega.org/userfiles/file/Government/Planning_Zoning/GeneralOrdinance
s/CHAPTER_31-GENERAL_OFFENSES%203-9-09.pdf .

when such person commits any of the following: (1) Acts in a violent or tumultuous manner toward another person whereby such person is placed in reasonable fear of safety of such person's life, limb or health."  O.C.G.A. § 16-11-39(a)(1).

As to Ashley, the record is undisputed and defendant himself has admitted on numerous occasions that nothing in Ms. Jaipersaud's conduct on the day of the incident caused him any fear.  (Ashley Dep. 94:8-13; SMF Attachment "G" [State v. Jaipersaud, Trial Tr. 66:7-24].)  And the undisputed, objective facts support this, as Ashley has testified that Ms. Jaipersaud never (a) cursed at him; (b) physically or verbally threatened him; or (c) put her hands on him.  (Ashley Dep. 72-73; SMF Attachment "G" [State v. Jaipersaud, Trial Tr. 66:7-24].)  Moreover, the store's surveillance video, which captured Ms. Jaipersaud's dealings with Ashley in their entirety, at no point documented any conduct by Ms. Jaipersaud toward Ashley that could be described as "violent or tumultuous."  (*See* SMF Attachment "B" [9/24/2008 video at 8:18 to 13:40 (*front view* at 12:46:37 to 12:59:10], 33:07 to 34:56 (*back view* at 12:53:28 to 12:59:06)].)  Such objective and undisputed facts simply cannot support a finding of probable cause under the disorderly conduct provision at issue.  *Cf. Williams v. State*, 305 Ga. App. 657, 658-62 (2010) (officer lacked probable cause to arrest defendant for disorderly conduct under O.C.G.A. § 16-11-39(a) where defendant "said something unintelligible in a loud voice and tried to walk around the officers and go inside [his home]"); *Meadows v. State*, 303 Ga. App. 40, 42 & n.9 (2010) (officer lacked probable

to arrest defendant for disorderly conduct where arresting officer "admitted during the encounter the only person Meadows was cursing about was his girlfriend and that Meadows was not acting violently toward any other person or another person's property"); *Dudley v. State*, 264 Ga. App. 845, 846 (2003) (reversing conviction under O.C.G.A. § 16-11-39(a)(1) for insufficient evidence where officer arrested defendant "for failing to obey his instructions … not to curse").

Defendant, moreover, cannot possibly suggest that he had probable cause to arrest Ms. Jaipersaud because of her "violent or tumultuous" behavior toward any other individual, such as his fellow officers or the Nobles.[6]  Ashley testified that he never saw Ms. Jaipersaud "interacting" let alone being "uncooperative" with the other officers. (Ashley Dep. 68:7-19.)  The exchange between Ms. Jaipersaud and the Nobles had already ended by the time Ashley and the other officers arrived on scene.  (*Id.* at 66.)  Thus, no officer, including Ashley knew what had actually transpired between Ms. Jaipersaud and the Nobles, aside from what they were told by the disputing parties.  (*Id.* at 66-67.)  These conflicting stories could not have supported a finding of probable

---

[6] While Ashley has denied that he arrested Ms. Jaipersaud over her dispute with the Nobles (Ashley Dep. 139), the record suggests that this dispute constituted at least one objective fact which led to his arrest of Ms. Jaipersaud.  First, Ashley indicated in his citation to Ms. Jaipersaud, upon arresting her, that she had "struck patron [Mr. Noble] while conducting business", a fact which Ashley admitted had factored into his probable cause calculus.  (SMF Attachment "H" [Citation]; Ashley Dep. 64 (stating that the citation is the "first legal document" completed for an arrest).)  Second, Ashley specifically cited Ms. Jaipersaud for violating subsections (c) and (k) of the local disorderly conduct ordinance, yet both of these provisions pertain to conduct – violent behavior or the use of "fighting words" – that by Ashley's own admission were completely absent in his dealings with Ms. Jaipersaud.  (Ashley Dep. 72-73.)

cause, however, especially since Ashley knew that the Nobles were already upset at Ms.

Jaipersaud because they were unable to purchase gas at the station (SMF Attachment

"G" [State v. Jaipersaud, Trial Tr. 60-61]) and therefore had reason to question the

credibility of their allegations against Ms. Jaipersaud. *Hebron v. Touhy*, 18 F.3d 421,

422-23 (7th Cir. 1994) (Easterbrook, J.) ("Sometimes information from or about a

person claimed to be the victim of crime would lead a reasonable officer to be

suspicious, making further investigation prudent – and, because the 'reasonableness'

standard of the fourth amendment links the constitutional obligation to the standard of

prudent conduct, the officer must do more") (citations omitted).[7]  For these reasons,

Ashley lacked probable cause to arrest Ms. Jaipersaud under O.C.G.A. § 16-11-39(a)(1)

as to her conduct toward himself or any other party.

4.     Ashley Lacked Probable Cause to Arrest Ms. Jaipersaud for Misdemeanor
         Obstruction Under Georgia State Law

The undisputed facts in this case do not allow for a finding of probable cause

under Georgia's misdemeanor obstruction statute.  Pursuant to O.C.G.A. § 16-10-24(a),

"a person who knowingly and willfully obstructs or hinders any law enforcement officer

in the lawful discharge of his official duties is guilty of a misdemeanor."  As

documented in the surveillance video, the accuracy of which cannot be reasonably

---

[7] Indeed, Ashley's insistence on viewing the surveillance video from earlier in the day is proof that
Ashley himself did not believe he had probable cause to arrest Ms. Jaipersaud simply on the basis of
the conflicting stories that he had been told by the Jaipersauds and the Nobles, which, at that point,
constituted the entire universe of information for Ashley as to any allegations of disorderly conduct on
the part of Ms. Jaipersaud vis-à-vis the Nobles.  (Ashley Dep. 67.)

contested, the entire police investigation lasted thirteen minutes until Ms. Jaipersaud was arrested by Ashley. (SMF Attachment "B" [9/24/2008 video at 07:38 to 13:50 [*front view* at 12:45:18 to 12:59:10]].) Nothing in Ms. Jaierpsaud's behavior during this brief period of time can be reasonably construed as obstructive; in fact, the video shows that Ms. Jaipersaud had almost no contact with Ashley up until her arrest.

The undisputed facts also establish that Ms. Jaipersaud went out of her way to cooperate with the police, including Ashley, from the outset of their investigation. When it came time to look at the surveillance video, Ms. Jaipersaud and her husband provided the officers with unlimited access to the video surveillance system even though they both knew nothing about how to operate the machine. (Ashley Dep. 52, 91, 93:22-24, 165:1-7; Jaipersaud Dep. 39.) At the insistence of Ashley, Ms. Jaipersaud even sought to contact her son, albeit unsuccessfully, in an effort to have him come to the store to assist the officers in playing back the surveillance video. (Ashley Dep. 74:14:21.)

To the extent that defendant claims Mr. Jaipersaud intentionally refused to contact her son or was otherwise willful in her failure to assist the officers in viewing the video, such a claim is clearly contradicted by the record. Based on the surveillance video, Ashley and the other officers spent ***at most*** six minutes trying to operate the video surveillance system. *See supra* note 3 and accompanying text. After that time, Ashley grew frustrated and angry, and demanded, repeatedly, that Ms. Jaipersaud

furnish the immediate presence of her son at the store. The record is without dispute, however, that when Ashley made this demand upon Ms. Jaipersaud she had informed Ashley that (a) her son was then attending classes at Clayton State University, which was over an hour's drive from the station, and (2) she had tried to call but could not reach her son. (Ashley Dep. 74-75, 120, 168; Jaipersaud Dep. 39.) Yet Ashley continued to "press" (Ashley Dep. 70) Ms. Jaipersaud for her son's immediate presence, and ultimately arrested her when she could not deliver. Ms. Jaipersaud's inability to abide by this " 'overly broad and unreasonable demand' " did not give Ashley probable cause to arrest her for obstruction. *Reese v. Herbert*, 527 F.3d 1253, 1273 (11th Cir. 2008) (quoting *Woodward v. Gray*, 241 Ga. App. 847, 850 (2000), *disapproved of on other grounds by Stryker v. State*, 297 Ga. App. 493, 495 n.1 (2009)). *Accord Skop*, 485 F.3d at 1138.

The Eleventh Circuit Court of Appeals has held as much in cases like the one here. Thus in *Skop*, a City of Atlanta police officer arrested Skop for obstruction after she had asked the officer to move his patrol car which was then blocking the driveway to Skop's residence. *Id.* at 1133-34. Skop was just returning home from work, and the officer was using his car as an "impromptu roadblock" after a tree had been knocked down in a storm. *Id.* at 1133-34, 1139. Skop made several requests for the officer to move his car which went either unnoticed by the officer or were ignored by him. When Skop grew frustrated and asked the officer for his name and badge number, the officer

exited his car, and, after a brief exchange, arrested Skop. *Id.* at 1134. In finding such

an arrest illegal, the *Skop* court stated the following:

> Simply put, helping a stranded motorist like Skop *was* one of Brown's
> official duties and the argument that Brown was impeded in this duty
> because Skop asked Brown to pull his car one foot forward – a request
> politely made, without raised voice or threat, and in a situation where she
> was not distracting his attention from a threatening situation – is utterly
> devoid of merit. Indeed, *the suggestion that a citizen asking an officer to*
> *assist her thereby provides him with probable cause or even arguable*
> *probable cause to arrest her is without foundation in our law.*

*Id.* at 1138 (footnote omitted and second emphasis added).[8]

In the same vein, it would be meritless to suggest that Ashley had probable cause

to arrest Ms. Jaipersaud, when she was the one who had initially requested police

assistance[9] and had cooperated completely with the investigation, but then, as Ashley

---

[8] *See also Davis v. Williams*, 451 F.3d 759, 767 (11th Cir. 2006) ("Neither an owner's simple inquiry as to why officers are present on his property nor a person's attempt to bring a dangerous situation to the officer's attention can be construed as obstruction of justice or disorderly conduct"), *cited in Skop*, 485 F.3d at 1138. *Accord Reese*, 527 F.3d at 1273 (officer lacked probable cause to arrest under Georgia's misdemeanor obstruction statute where apartment caretaker asked arresting officer about moving police vehicles for his tenants but did not impede or hinder the arresting officer in his duties).

[9] While the defendant apparently disputes that he had responded to Ms. Jaipersaud's call for assistance, as opposed to that of the Nobles (Ashley Dep. 135), who were also seen on the surveillance video using their cell phones prior to the arrival of the police, there is no dispute that: (a) Ms. Jaipersaud did, in fact, place a call to the Lawrenceville Police Department requesting assistance in dealing with the Nobles (Jaipersaud Dep. 28); (b) this call by Ms. Jaipersaud was documented in a CAD Operations Report (SMF Attachment "D"); (c) this CAD Operations Report was the **only** document produced by the defendant in response to the following document request by plaintiff: "Please produce **any** and **all** recordings of radio calls or communications to and from 911 dispatch operators ***concerning the*** ***incident giving rise to this litigation***" (Pl.'s Second Requests for Production of Documents at 7 ¶ 4, attached hereto as Ex. B; Def.'s Response to Pl.'s Second Requests for Production of Documents at 9, 14-17, attached hereto as Ex. C) (emphases added); and (d) information contained on the above-referenced CAD report, including the identity of the caller/complainant, was available to one or more of the officers at the time they had responded to Ms. Jaipersaud's station on September 24th (*see* Ashley Dep. 103) and which, by virtue of the law enforcement collective knowledge doctrine, is

began making unreasonable demands upon Ms. Jaipersaud, questioned his authority for doing so. Ms. Jaipersaud was well within her constitutional rights to voice her opinions to Ashley, particularly in the face of Ashley's impossible investigatory demands. *Skop*, 485 F.3d at 1139 ("[T]he idea that Skop's brief inquiry to the officer somehow provided a basis for arrest collides head-on with the First Amendment"). As Justice Brennan famously pronounced in the seminal case of *City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987), "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." (footnote omitted). *See also* discussion *infra* pp. 22-23.

As a final note, plaintiff is aware that Ashley, in his deposition, stated for the very first time since Ms. Jaipersaud's arrest that he told Ms. Jaipersaud he would be willing to wait at the store until her son returned from school and that Ms. Jaipersaud still refused to contact her son. (*See, e.g.*, Ashley Dep. 71.) This post-hoc, self-serving statement should be given no weight by this court in considering plaintiff's motion for partial summary judgment. As the Supreme Court recently instructed in *Scott v. Harris*, 550 U.S. at 380, "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

---

imputed upon Ashley, *see Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983) ("[W]here law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all") (citation omitted).

should not adopt that version of facts for purposes of ruling on a motion for summary judgment." Here, not only is Ashley's after-the-fact explanation clearly contradicted by his prior testimony at Ms. Jaipersaud's criminal trial (State v. Jaipersaud, Trial Tr. 62:18-63:13)[10] it flies in the face of how his investigation into the September 24th incident actually unfolded, which, as in *Scott*, was documented in a video recording. The investigation proceeded and ended in hurried fashion, with Ashley deciding after only thirteen minutes into it that he wanted the son's immediate presence or nothing at all. Neither Ashley nor any other officer remained at plaintiff's store to await the son's arrival after Ms. Jaipersaud was arrested. Nor did Ashley or any other officer ever return to Ms. Jaipersaud's gas station in an effort to view the video, despite Ashley's acknowledgement that such a "follow-up investigation" could have taken place. (Ashley Dep. 75:16-20, 76:3:17.)[11] Simply put, no reasonable juror could find that Ashley had probable cause to arrest Ms. Jaipersaud for obstruction based on the undisputed facts, and plaintiff is entitled to summary judgment as to Ashley's liability on her Fourth Amendment claim.

## B. ASHLEY IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR HIS ARREST OF MS. JAIPERSAUD

---

[10] Significantly, this testimony constitutes a party admission by Ashley and should therefore considered by this court for its substantive as well as its impeachment value. *See* Fed. R. Evid. 801(d)(2)(A).

[11] Ashley's explanation that he never returned to Ms. Jaipersaud's store because he "did not want to subject [himself] to some allegation that was not true" is precisely the kind of post-arrest, self-serving statement that was flatly rejected by the court in *Skop*. 485 F.3d at 1142-43.

1.    <u>Legal Standard</u>

As a governmental official sued in his individual capacity for an alleged constitutional violation, Ashley may be entitled to qualified immunity.  This affirmative defense must be pled by the official-defendant, and, if met, "offers complete protection for individual government officials performing discretionary functions[12] 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Randall v. Scott*, 610 F.3d 701, 714 (11th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (footnote omitted).  It serves the dual purpose of " 'hold[ing] public officials accountable when they exercise power irresponsibly [but] shield[ing] officials from harassment, distraction and liability when they perform their duties reasonably.' " *Id.* at 714-15 (quoting *Pearson v. Callahan*, 555 U.S. ___, 129 S. Ct. 808, 815 (2009)).  In the false arrest-police misconduct context, the qualified immunity defense "recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who *unreasonably* conclude that probable cause exists." *Skop*, 485 F.3d at 1137.

This Circuit follows a two-step inquiry in determining whether an officer is entitled to qualified immunity: first, the court "must decide whether the facts alleged,

---

[12] Plaintiff does not dispute that Ashley was performing a discretionary function when he arrested her on September 24th. *See, e.g.*, *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).

assuming they are true, demonstrate that the defendant[] violated a constitutional right." *Kingsland*, 382 F.3d at 1232 (11th Cir. 2004) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "If this is answered in the affirmative, [the court] proceed[s] to the second query, which is to determine whether the right violated was clearly established." *Id.*

It is important to note, however, that the defense of "[q]ualified immunity is, as the term implies, qualified. It is not absolute. It contemplates instances in which a public official's actions are not protected." *Id.* at 1233 (citations omitted). Thus, as the court in *Kingsland* declared: "The principles behind qualified immunity would be rendered meaningless if such immunity could be invoked to shelter officers who, because of their own interests, allegedly flout the law, abuse their authority, and deliberately imperil those they are employed to serve and protect." *Id.* at 1234.

2.    Ashley's Violation of a Constitutional Right

It is well established that " 'an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment." *Id.* at 1232 (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003)) (additional citation omitted). Plaintiff submits that she has established such a violation vis-à-vis Ashley for the reasons already given in her core summary judgment liability analysis. *See* discussion *supra* Parts III.A.2, .3.

To strip Ashley of his cloak of qualified immunity in the false arrest context requires a different showing, however. Thus, taking Ms. Jaipersaud's allegations as

true, which the court is required to do in a qualified immunity analysis,[13] it must be shown that Ashley did not have "arguable probable cause" to arrest Ms. Jaipersaud. *Skop*, 485 F.3d at 1137. Under Eleventh Circuit law, arguable probable cause exists if " 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] *could have believed* that probable cause existed to arrest.' " *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)).

The outcome of the court's arguable probable cause analysis in this case hinges, clearly, upon the alleged refusal of Ms. Jaipersaud to contact her son to assist in the police investigation. On this point, however, and when viewing the facts in the light most favorable to plaintiff, this court should "easily conclude that a reasonable officer could not conceivably have thought that he had probable cause or even probable cause to arrest [Ms. Jaipersaud] – plainly she did not 'obstruct' or 'hinder' [Ashley] in the lawful discharge of his official duties, and she certainly did not do so 'knowingly and willfully.' " *Skop*, 485 F.3d at 1138 (quoting O.C.G.A. § 16-10-24(a)).

As a concerned business owner and having done nothing wrong herself, Ms. Jaipersaud clearly had an interest in having Ashley complete his investigation as soon as

---

[13] *See Saucier*, 533 U.S. at 201 ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: *Taken in the light most favorable to the party asserting the injury*, do the facts alleged how the officer's conduct violated a constitutional right? This must be the initial inquiry") (citation omitted and emphasis added). *Accord Davis*, 451 F.3d at 762 ("If, *assuming the plaintiff's allegations were true*, no such right would have been violated, the [qualified immunity] analysis is complete") (citing *Saucier*, 533 U.S. at 201) (emphasis added). *See also Beecham v. City of Sacramento*, No. Civ. S-07-1115-JAM-EFB, slip op. at 24-25 (E.D. Cal. Oct. 22, 2008) (order granting in part and denying in part *plaintiffs'* motion for summary judgment) (viewing facts in light most favorable to plaintiff "as the injured party" and denying qualified immunity), attached hereto as Ex. D.

possible so as to minimize its disturbance on her customers. (D. Jaipersaud Decl. ¶ 55.) It was Ms. Jaieprsaud's idea that Ashley look at the surveillance tape find out which of the complainants was telling the truth. (Jaipersaud Dep. 46.) Ms. Jaipersaud cooperated fully with the investigation from the very outset, as did her husband. (Ashley Dep. 92:13-17; D. Jaipersaud Decl. ¶ 76.) Ms. Jaipesaud even suggested to Ashley that he take the entire video surveillance machine with them, an offer that he declined to accept. (D. Jaipersaud Decl. ¶ 62.) By Ashley's own admission, Ms. Jaipersaud never cursed at or threatened him in any way. (Ashley Dep. 72-73.) When Ashley angrily commanded Ms. Jaipersaud to contact her son, she sought to comply even after explaining to Ashley that her son was in the middle of class and would probably not answer his phone. (Jaipersaud Dep. 36; D. Jaipersaud Decl. ¶ 59; A. Jaipersaud Decl. ¶ 25.) But Ashley continued to belligerently demand her son's immediate presence and then threatened Ms. Jaipersaud with arrest if she could not satisfy this impossible demand. (Jaipersaud Dep. 40; D. Jaipersaud Decl. ¶ 64.) At this point, Ms. Jaipersaud asked Ashley in a normal tone of voice (Jaipersaud Dep. 47:25-48:2) what he would arrest her for to which he responded "for not cooperating or something like that …" (*id.* at 40:11-12). Ashley then grabbed Ms. Jaipersaud by her arm and pulled her out of her own store.

In *Davis v. Williams*, 451 F.3d at 764-67, the Eleventh Circuit considered an analogous situation of an owner who was arrested on his own property for disorderly conduct and obstruction where there was no evidence that the owner, Davis, physically

interfered with, cursed at, or threatened the officers.  When Davis asked the officer why he was on his property, the officer threatened Davis with arrest.  Davis responded by asking what he would be arrested for and then requested to speak with the officer's superior.  As Davis turned his back to the officer and began to walk back to his house, the officer arrested Davis.  In this factual scenario, the court denied qualified immunity to the officer, finding a lack of arguable probable cause for Davis' arrest.  *Id.* 766-67.  In doing so, it stated the following:

> Neither an owner's simple inquiry as to why officers are present on his property nor a person's attempt to bring a dangerous situation to the officer's attention can be construed as obstruction of justice or disorderly conduct.  Nor can a citizen be precluded by the threat of arrest from asking to speak to an officer's superior or form asking for an officer's badge number.  Those inquiries likewise do not constitute obstruction of justice or disorderly conduct.

*Id.* at 767.

Accordingly, under plaintiff's version of facts and consistent with this Circuit's precedent, Ashley is simply not entitled to qualified immunity.  Ms. Jaipersaid never knowingly, let alone, willfully, prevented Ashley from conducting his investigation.

Ms. Jaipersaud's questioning of Ashley is similarly an insufficient basis upon which to confer qualified immunity, regardless of whether one considers Ms. Jaipersaud's statement to Ashley "criticism or and challenge" or, more likely, an "attempt[] to clarify a perfectly reasonable question direct to the officer."  *Skop*, 485 F.3d at 1139.  Just as in *Skop*, where the court denied qualified immunity to an officer

for arresting the plaintiff after she asked him to move his patrol car one foot forward and then when ignored, asked for the officer's name and badge number, Ms. Jaipersaud's questioning of Ashley about both his overly broad investigative demands and his threats of arrest do not provide "probable cause or arguable probable cause to arrest for obstruction." *Id.*

Even assuming, for the sake of argument, that Ashley did have arguable probable cause to arrest Ms. Jaipersaud because she was obstructive in her behavior – a contention plaintiff vigorously disputes – Ashley's aggressive, belligerent, and unreasonable behavior toward Ms. Jaipersaud meant that he was no longer "in the lawful discharge of his official duties" pursuant to O.C.G.A. § 16-10-24(a), and therefore cannot be immune from suit on plaintiff's Fourth Amendment claim. The case of *Thornton v. City of Macon*, 132 F.3d 1395 (11th Cir. 1998) (per curium) is instructive on this point. In *Thornton*, the court denied qualified immunity to officers who were initially called in by an ex-girlfriend of the plaintiff, Thornton, to assist in mediating a domestic dispute, but, instead, arrested the plaintiff for obstruction. In doing so, the *Thornton* court stated the following:

> Officer Coleman was dispatched to Mullis' house to address a civil dispute, and had "the general duty" – and the authority – "to enforce the law and maintain the peace." [*Duncan v. State*, 163 Ga. App. 148 (1982).] Coleman's and the other officers' actions here far exceeded that authority. Coleman lawfully could peaceably approach the front door of Thornton's apartment and attempt to deliver the keys and retrieve the mattress; in so doing he would merely be attempting to mediate and defuse a contentious situation. He and the other officers could not force Thornton to make such

an exchange, however, and they could not remain on Thornton's property after Thornton had refused to make the exchange. Thornton had committed no crime and had not threatened anyone; once he had asked the officers to leave, their continued presence – and their attempt to retrieve Mullis' mattress by force – was not pursuant to their official duties and was outside of their authority. *After that point, they were no longer maintaining the peace; they were instead merely attempting forcibly to resolve a civil dispute. No reasonable police officer would have believed that the officers had probable cause to arrest Thornton for "obstruction" of such unauthorized actions.*

*Id.* at 1399 (footnote omitted and emphasis added).

As in *Thornton*, Ashley's unabated demand of Ms. Jaipersaud that she furnish the immediate presence of her son "far exceeded [his] authority" in investigating a domestic dispute. Once Ms. Jaipersaud told Ashley that she had tried but could not reach her son at school, Ashley could no longer force her to find a way to get her son to the store. Instead, Ashley had to find another time or method to view the video, a solution that Ashley himself admitted was readily available to him. (Ashley Dep. 121:7-21.) By demanding otherwise, however, Ashley forced Ms. Jaipersaud into an impossible situation where she had no choice but to disobey his directive.

3.  Ashley Violated a Clearly Established Right When He Arrested Ms. Jaipersaud Without Arguable Probable Cause

Having established that Ashley arrested Ms. Jaipersaud without arguable probable cause, "[t]he second qualified immunity inquiry is … straightforward." *Id.* at 1143. At the time of Ms. Jaipersaud's arrest, it was clearly established under Eleventh Circuit precedent that an officer violates the Fourth Amendment when he arrests an individual

for disorderly conduct or obstruction without arguable probable cause. *Id.* at 1143-44 ("[O]ur binding precedent clearly established, at the time of Skop's arrest, that an arrest made without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures"). *See also Reese*, 527 F.3d at 1272-73; *Davis*, 451 F.3d 759, 764 n.8 (11th Cir. 2006); *Thornton*, 132 F.3d at 1399 (11th Cir. 1998). More fundamentally, it has long been a principle of our Constitution that the First Amendment prohibits States from "provid[ing] the police with unfettered discretion to arrest individuals for words or conduct that annoy them." *Hill*, 482 U.S. at 465. *See also Nowell v. City of Cincinnati*, 414 U.S. 14, 16 (1973) (reversing conviction for disorderly conduct where the Court found "that petitioner was arrested and convicted merely because he verbally and negatively protested [the officer's] treatment of him"). At bottom, Ashley had "fair notice" at the time he arrested Ms. Jaipersaud that he was in violation of the constitution, yet he still decided to effectuate the arrest anyway. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). (*See also* Ashley Dep. 47:23-48:11.) In this scenario, qualified immunity is unwarranted. As the court in *Skop* stated: "[w]hen an officer plainly violates the legal rights of the people he serves, and when a reasonable officer in his position had fair warning that his conduct was unlawful, § 1983 suits exist to provide a vehicle for recourse." 485 F.3d at 1144.

# IV.

## CONCLUSION

For the above reasons, plaintiff respectfully requests that this Court enter Partial Summary Judgment as to liability against Defendant Timothy Ashley on plaintiff's federal claim that Ashley violated plaintiff's Fourth Amendment rights against unreasonable searches and seizures when he arrested her without probable cause or arguable probable cause.[14]

Respectfully submitted this 3rd day of March 2011.


/s/ Albert Wan
Georgia Bar No. 334224
albert@albertwanlaw.com
Attorney for Plaintiff


1201 Peachtree Street
400 Colony Square, Suite 200
Atlanta, GA 30361
404-872-7760 – Tel.
404-872-7764 – Fax

---

[14] Plaintiff's counsel certifies that this brief is in Times New Roman, 14 point.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2011, I electronically filed the attached with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Kendrick K. McWilliams, Esq.
Attorney for Defendants
Shivers & Associates
Caller Service No. 1808
Alpharetta, GA 30023-1808
678-317-7104 – Tel.
678-317-8917 – Fax
kmcwilli@travelers.com – Email

/s/ Albert Wan
Georgia Bar No. 334224
Attorney for Plaintiff

1201 Peachtree Street
400 Colony Square, Suite 200
Atlanta, GA 30361
404-872-7760 – Tel.
404-872-7764 – Fax
albert@albertwanlaw.com – Email