# SMF ATTACHMENT "G"

IN THE STATE COURT FOR THE COUNTY OF GWINNETT
STATE OF GEORGIA

STATE OF GEORGIA,              )
      Plaintiff,           )
                     )   CASE NUMBER
      vs.                  )   08-D-8932-6
                     )
DRUPATTY JAIPERSOUD,           )
      Defendant.           )

**CERTIFIED
COPY**

- - -

Transcript of the Jury Trial,

before the Honorable Pamela D. South,

sitting for the Honorable John F. Doran, held at the

Gwinnett County Justice and Administration Center,

on the 24th and 25th days of February 2009.

APPEARANCES OF COUNSEL:

For the State:

                    DAVID YOUNG
                    Assistant Solicitor

For the Defendant:

                    RAMON ALVARADO
                    Attorney at Law

LINDA S. ARCHIBALD, CCR-B-2010

Official Court Reporter
for Judge Pamela D. South
75 Langley Drive
Lawrenceville, Georgia 30045
(770) 822-8545

1    MR. ALVARADO:  Judge, I don't have any questions for

2    Ms. Noble.  Thank you.

3    THE COURT:  All right.  Ma'am, I'm going to allow you

4    to step down.  Please don't discuss your testimony until

5    the Court tells you to do so.  You're under the rule of

6    sequestration.  Who is your next witness, Mr. Young?

7    MR. YOUNG:  State's going to call Detective Ashley to

8    the stand, your Honor.

9    THE COURT:  Okay.  Detective Ashley.

10   MR. YOUNG:  Those witnesses can be excused by the

11   State.

12   MR. ALVARADO:  I've got no objection.

13   THE COURT:  Okay.  If you want them excused you can --

14   You're going to release them from the case in its entirety?

15   MR. YOUNG:  We can release them at this time.

16   THE COURT:  Yes.  If there's no objection they can be

17   released.

18   MR. ALVARADO:  No objection.

19   THE COURT:  All right.  They are free to go.  Come on

20   up to the witness stand, sir.  Swear your witness.

21                DETECTIVE TIM ASHLEY,

22   having been first duly sworn, was examined

23   and testified as follows:

24                DIRECT EXAMINATION

25   BY MR. YOUNG:

1    Q    Please state your name for the record.

2    A    Tim Ashley.

3    Q    Detective Ashley, by whom are you employed?

4    A    Lawrenceville Police Department.

5    Q    How long have you been employed by the Lawrenceville

6  Police Department?

7    A    I've been at Lawrenceville 12 years.

8    Q    Do you have any prior law enforcement experience?

9    A    25 years.

10    Q    25 total --

11    A    Total.

12    Q    -- law enforcement experience?  What's your current

13  position with the City of Lawrenceville?

14    A    I'm a persons' crimes detective.

15    Q    Can you explain for the jury what a persons' crimes

16  detective is?

17    A    Crimes against persons.  I work things like mostly

18  child molestations, robberies, armed robberies, murders, things

19  like that.

20    Q    Are you a POST certified law enforcement officer?

21    A    Yes, sir.

22    Q    Can you explain to the jury what that means as well.

23    A    I have completed an academy in 1986 that one has to

24  complete before he can be a police officer in the state of

25  Georgia, before he's qualified to be a police officer in the

51

1   state.

2   Q   Okay.  Detective, I'm going to direct your attention

3   to September 24th, 2008, to the Chevron station at 56 [sic]

4   Hurricaine Shoals Road in Lawrenceville.  Did you happen to be

5   dispatched to that location at any point in time on that day?

6   A   Actually I was in the area when I heard a fight call

7   go out at that location.

8   Q   Did that come over dispatch, the fight call?

9   A   That came over radio, yes, sir.

10  Q   All right.  Were you in a marked police vehicle?

11  A   No.  I was in a black detective car, blacked-out

12  windows, Crown Victoria.

13  Q   And as a detective were you in any kind of uniform or

14  not?

15  A   I had on a polo shirt with a badge on it, khaki pants

16  with a badge here (indicating), weapon on my right side.

17  Q   Okay.  So the badge was displayed --

18  A   Yes, sir.

19  Q   -- as was the weapon?  Did you respond to that

20  location?

21  A   I did.

22  Q   Were you the first person on the scene, or was there

23  any other officers there?

24  A   Ron Cone and I arrived about the same time.  I got

25  there just a couple of seconds before he did.

1    Q    And when you arrived at the scene what time was it
2  about?

3    A    I don't recall exactly what time it was; afternoon,
4  early afternoon.

5    Q    Okay.  And you were on duty at the time?

6    A    I was.

7    Q    What happened when you initially arrived at that
8  location?

9    A    When I initially arrived I got out of the car.  And
10  there was a black male, black female approached me and explained
11  that they had stopped there, attempted to buy gas and --

12    Q    Were you able to identify who these two people were?

13    A    Yes.  Mr. and Mrs. Young?  I don't recall their last
14  name.  It was a taller black gentleman, and his wife was quite
15  tall as well.

16    Q    Okay.  Do you need to refresh your memory at all
17  concerning them?

18    A    I didn't bring my report in.  I apologize.

19    Q    Would it help if you could review your report to
20  refresh your memory at this time?

21    A    Yes.

22         THE COURT:  And don't read it out loud, Officer.  Just
23     take a look at it and refresh your recollection.

24  BY MR. YOUNG:

25    Q    After reading your report does it refresh your

53

1    recollection about this incident at all?

2        A    Mr. and Mrs. Noble were their names, Leon and

3    Nathalie.

4        Q    Okay.  And so they described this incident to you?

5        A    They did.

6        Q    Okay.  And after they described what had happened to

7    you what did you do?

8        A    While I was speaking with Mr. and Mrs. Noble, Officer

9    Cone went inside the store.  And he spoke with the owner and the

10   lady that was present, which is the lady here sitting --

11       Q    Do you see the owner of the store in court today?

12       A    The lady that was there, yes.  She's sitting there

13   with her defense counsel.

14       Q    Is that Mrs. Drupatty Jaipersaud?

15       A    I suppose.  It was a strange name.  I couldn't

16   pronounce it.  I'm sorry.

17       Q    Do you need to refresh your recollection?

18       A    I remember it started with a J so, yeah, you're

19   correct.

20       Q    Do you see that individual in court today?

21       A    Yes.

22       Q    And you identified where she's seated?

23       A    Yes, sir.

24            MR. YOUNG:  For the record, the detective has

25       identified the defendant in this case as being the owner of

                                  54

1      the store.

2    BY MR. YOUNG:

3        Q    And after Officer Cone was talking to her did you go

4    inside, or did you remain outside?

5        A    I went inside.

6        Q    Okay.  Did you observe any of the conversation between

7    Officer Cone and the defendant?

8        A    Not really, not really.  As I -- when I went inside

9    Officer Cone was the first one to respond, so he was doing the

10   police report.  He was gathering information for that.  So I

11   believe at some point after I went outside he went back out and

12   spoke with Mr. and Mrs. Noble to get their information for the

13   report.

14       Q    Okay.  Did you ever have a chance to talk to the

15   defendant at all?

16       A    Yes.

17       Q    Okay.  When?  At what point in time did you talk to

18   her?

19       A    After I went inside, when I finished talking to Mr.

20   and Mrs. Noble.

21       Q    Okay.  Was -- what happened when you talked to the

22   defendant?

23       A    She was quite upset when we talked.  She stated that

24   these people had come into the store and started an argument

25   with her.  I asked her why they started an argument.  She said

55

1   because there was no gas in the gas pumps.   During our
2   conversation I explained to her, to this lady, that according to
3   the Nobles she had made a racial slur while they were inside the
4   store.   She also --

5       Q      How did she --

6       A      Excuse me?

7       Q      What else did you say to the defendant?

8       A      I told her that that was part of the complaint that I
9   had got from the Nobles while I was talking to them outside.

10      Q      How did she respond?

11      A      She responded and said that the Nobles had come in and
12  during the argument had made a -- some type of a racial comment
13  to her regarding a word that is very offensive to Indian people,
14  to people from India.

15      Q      Did you pursue that any further?

16      A      Yes.   I asked her, you know, how long she had been
17  living here, how long she had been gone from India.   And she
18  said she wasn't from India.   She was from Pakistan.

19      Q      What did you do after -- Did you say anything else to
20  her at that time?

21      A      I asked her if her video cameras were working, and she
22  said yes.

23      Q      Why did you ask her that?

24      A      Well, I saw the video cameras there.   And there were a
25  couple of them, one of them located out in the lobby area there

1    when you first walk in.  And there was another one pointing
2    inside the store area where she and her husband did business,
3    where the cash register and everything was.  So I asked if they
4    were functional cameras.  And she said they were.  And I asked
5    then if I could see the video for the past 20, 30 minutes, or
6    whenever this incident allegedly occurred.
7        Q    And why were you looking to see that specific
8    timeframe?
9        A    Because Mr. Noble, when I spoke with him outside, said
10   that when he went inside and spoke to her that there was an
11   argument and that she had slapped him.
12       Q    Okay.  Did you want to see that on the video?
13       A    I said, Where did that happen?  He said, It happened
14   right inside that door.  So when I seen that there was video
15   inside the store and she said it was working, I wanted to see
16   when and if that had occurred.
17       Q    Okay.  How did she respond to you wanting to see the
18   video?
19       A    She said she didn't know how to operate the video
20   machine.
21       Q    What did you do after she told that you?
22       A    I asked her who did, and she said her son did.  I
23   asked her where her son was, and she said he was in school.  So
24   I asked her to call him to see if he could come over and work
25   this video for us so that I could see what had actually happened

57

1    and if someone may have told me something that may have not have
2    been true.  She said she wouldn't do that.  And she said she
3    would not call him and have him come over there from school.

4        Q    And what happened after the defendant refused to call?

5        A    I explained to her that this was an ongoing police
6    investigation and that we would stay as long as we needed to
7    until he could get there because we did need to see this video.
8    Then she became very agitated and raised her voice and looked at
9    me and said, You don't come in my store and tell me what I'm
10   going to do in my store.

11       Q    What -- and can you describe how agitated she was at
12   that time?

13       A    Yes.  She was very agitated.  We were standing inside
14   the area where she and her husband stand, inside the area where
15   the cash register is.  She had walked over to the cash register.
16   I was standing there where the video machine was.  She had
17   walked over there.  And then when I told her we would stay as
18   long we needed to, she turned around and pointed her finger at
19   me and walked back toward me and said, You're not going to sit
20   here and tell me what to do in my own store.

21       Q    And as she is walking toward you did she say or do
22   anything else?

23       A    No.

24       Q    Okay.  What did you do at that point in time?

25       A    I placed her under arrest.

1    Q    And why did you place the defendant under arrest?

2    A    Because of the complaint that she had slapped this

3  gentleman, and she was being disorderly to me.

4    Q    And how was she being disorderly towards you?

5    A    She was holding up the investigation.  All I had to do

6  was take a look at this video 20 minutes prior to my being

7  there, and I would have been able to say, yeah, this happened

8  or, no, it didn't; and we would have been on our way and out of

9  the store and away from them had we not found anything.  She

10 appeared to be -- for some reason she appeared not to want to

11 show me this video, and she did not want me to see this video

12 after I had specifically asked her to see it.

13         MR. YOUNG:  Thank you, Detective.  I have no further

14    questions.

15         THE COURT:  Cross-examination.

16                    CROSS-EXAMINATION

17 BY MR. ALVARADO:

18    Q    Good afternoon, Detective.  I'm Ramon.  I'm

19 representing Ms. Jaipersaud.  Just a couple questions for you.

20 Let me know if I'm confusing you.  I'll clear it up.  Okay?

21 Now, you arrived after obviously the police were called; right?

22    A    Yes, sir.  The call --

23    Q    So you didn't -- I'm sorry.  I don't want to speak

24 over you.  Go ahead.

25    A    That's okay.  The call had come out.  I was on

1   Hurricaine Shoals Road.   And I advised the dispatcher that I was

2   close by, and I would respond.

3        Q     So you didn't see the alleged incident with Mr. Noble?

4        A     No, I did not.

5        Q     Now, as far as who called the police, you were

6   dispatched out there.   So they just tell you there's something

7   going on.   You show up; correct?

8        A     It was dispatched as a fight call.

9        Q     You don't know who made the initial call, do you?

10       A     I do not, no, sir.

11       Q     Now, when you arrived at this gas station do you ever

12  have a chance to look at the sign out front?

13       A     The Chevron sign?

14       Q     The sign with the prices for gas.

15       A     No, not at that time I didn't notice that because the

16  reason I was responding there was because of a fight call.   So I

17  was looking in and around the front of the store or inside the

18  store as much as I could while I was driving up there to see if

19  there was still a fight going on.

20       Q     Now, Mr. Noble at some point tells you that part of

21  what's going on is that there's no gas.   He's upset about it.

22  Ms. Jaipersaud's upset about that also; right?   You know this

23  involves gas?

24       A     This started out according to Mr. Noble as he and wife

25  had stopped there to purchase gas, and there was no gas.

1   Q   Did he tell you at any point there was no sign on the
2   gas station -- on the pumps?
3   A   He said that he had gone inside and asked them to turn
4   on the pumps and that he was told there was no gas.  And he had
5   made -- he said that he commented that if there's no gas maybe
6   you should put a bag over the nozzles or a sign up somewhere
7   there saying that there's no gas for people like us that can't
8   tell if there's any gas.  That was the gist of what his
9   conversation with me.
10   Q   Now, at some point did you have an opportunity to go
11   up to the gas pumps?
12   A   Well, we were standing close by the gas pumps.
13   Q   Did you notice the sign?  Let me back up.
14   A   I didn't notice a sign that said that there was no
15   gas.
16   Q   Okay.  Did you notice something about the size of this
17   sheet of paper?  This is 9 by 11 I think.
18   A   I didn't see it, sir.  I didn't see it.
19   Q   Did you go to where Mr. Noble was, where his car was
20   parked?  Did you go out to that pump?
21   A   No, sir.  I didn't walk over there.
22   Q   Now, a lot of this case involves this video.  Wouldn't
23   you agree with that?
24   A   I'm sorry?
25   Q   A lot of the case involves this video that's in

61

1    dispute; right?

2        A    A lot of the case involves --

3        Q    You made a decision based on not being able to see the
4    video that day; correct?

5        A    That was part of -- yes, that is part of the reason
6    why she was arrested.

7        Q    Because you've been a detective for -- or an officer
8    for, what, 25 years?

9        A    Yes, sir.

10       Q    And you wanted to see what was on that tape?

11       A    Yes, sir.

12       Q    Because that would have helped you make a decision on
13   what Mr. Noble was saying or accusing my client of; correct?

14       A    That would have allowed me to know whether Mr. Noble
15   was telling the truth or whether this lady was telling the
16   truth.  It had everything to do with the outcome of the reason I
17   was there.

18       Q    Now, when you asked her to show you the video she told
19   you flat out she doesn't know how to use that machine; correct?

20       A    She and her husband, yes.

21       Q    She tells you at some point that her son does know how
22   to use that machine; correct?

23       A    Yes.

24       Q    And she tells you he's at school?

25       A    Yes.

62

1     Q    Now, with you there she attempts to call her son;
2 right?

3     A    I believe she may have attempted to call him one time.
4 But she did not make contact with him.

5     Q    And that very well could be because he is, in fact, in
6 school; right?

7     A    Could be.

8     Q    Now, she told you that he went to Clayton State, which
9 is an hour away?

10     A    Correct.

11     Q    And you still insisted on bringing him there
12 immediately?

13     A    I did.

14     Q    And at any point did you get aggressive with
15 Ms. Jaipersaud?

16     A    When I arrested her I took hold of her arm and put her
17 in handcuffs, I did.

18     Q    Well, let's talk about the moments before you arrest
19 her.  Did you ever get aggressive with her?

20     A    How do you mean aggressive?

21     Q    Let's break it down.  Did you ever stick your finger
22 in her face?

23     A    Not in her face, no.  She was across the room.

24     Q    So if on the video we have you sticking your finger in
25 her face, the video may be wrong?

63

1      A    I wouldn't say the video would be wrong, no.

2      Q    Then you might be wrong?

3      A    If pointed my finger at her I did not point my finger

4 in her face.  I may have pointed my finger at her.

5      Q    Let's break this down.

6      A    Okay.

7      Q    Let's break this down.  At some point she's standing 2

8 or 3 feet away from you and you have your finger pointed in her

9 face?

10     A    That could have been, yes, sir.

11     Q    At some point are you raising your voice to her as you

12 have your finger in her face?

13     A    When she told me that she would not contact her son

14 and that I would not tell her what to do in her own business, I

15 told her that I would complete this investigation.  And I may

16 have said that in a strong voice, yes, sir.

17     Q    When you told her -- Let me back up.  I'll withdraw

18 that.  When she said her son may not be able to come or would

19 not come because he was in school, you said without the video

20 you would place her under arrest; right?

21     A    I don't recall that.

22     Q    Okay.  So at no point you told her, If I don't see

23 that video I'm arresting you now?

24     A    No.

25     Q    Now, you have a lot of experience as an officer.  I'm

64

1    assuming you've been to these type of disputes before.  You've

2    handled disputes before; right?

3         A    Yes, sir.

4         Q    Now, people get upset at disputes?

5         A    Yes, sir.

6         Q    Both parties get upset?

7         A    Correct.

8         Q    And that's a common thing that you see through your

9    experience as an officer; right?

10        A    Yes, sir.

11        Q    Would you say it's natural to be upset if you're in a

12   dispute with a customer?

13        A    With a customer?  You're speaking of your client being

14   involved in a dispute with a customer?

15        Q    Let me -- That's not a good question.  Let me ask you

16   a better question.  Did it surprise you that she was upset

17   because of what was happening with Mr. Noble?

18        A    No, I wasn't really surprised.

19        Q    Now, if you don't mind, Detective, I want you to stand

20   up, and I want you to stand right here so the jury can see you.

21   Now, you are definitely a big guy, aren't you?  You work out?

22        A    Uh-huh (affirmative).

23        Q    How much do you bench?

24        A    I don't know.

25        Q    More that 200 pounds?

1     A     Yeah.

2     Q     You do.  Don't be shy:  225?

3           MR. YOUNG:  Your Honor, I don't think this is

4     relevant, how much he benches.

5           MR. ALVARADO:  Okay.  I'll move on.

6  BY MR. ALVARADO:

7     Q     How tall are you, Officer?

8     A     6-2.

9     Q     6-2.  How much do you weigh?

10    A     245.

11    Q     Were you scared of Ms. Jaipersaud that day?

12    A     I'm sorry?

13    Q     Were you scared of her that day?

14    A     No.

15    Q     At no point were you placed in reasonable fear of your

16    life or limb?

17    A     I wasn't afraid for my life if that's what you meant.

18    Q     How about your safety:  Were you afraid she was going

19    to hurt you?

20    A     She might have hit me.

21    Q     She might have hit you?

22    A     She could have hit me, sure.

23    Q     She didn't, did she?

24    A     No, she didn't.

25    Q     Okay.  Do you think this jury should put a lot of

1   weight in that video if they get a chance to see it?

2       A    The video that -- Actually I saw the video for the

3   first time this morning.  Sure.  I guess they can see what

4   actually happened before we got there.

5           MR. ALVARADO:  Thank you.  No further questions,

6       Judge.

7           THE COURT:  You can sit down, Officer.  Do you have

8       any other questions for the officer?

9           MR. YOUNG:  No other questions, your Honor.

10          THE COURT:  All right, then.  Do you want him

11      released?

12          MR. YOUNG:  He can be excused, your Honor.

13          MR. ALVARADO:  No objection.

14          THE COURT:  Sir, you are free to go.  All right.

15      Who's your next witness.

16          MR. YOUNG:  Your Honor, the State is going to call

17      Officer Cone.  And, your Honor, may I approach to get the

18      police report back as well?

19          THE COURT:  Yes.  Let's bring in Officer Cone.  [Brief

20      pause.]  Come on up, Officer, to the witness stand please.

21      If you will swear him in.

22                      OFFICER RON CONE,

23          having been first duly sworn, was examined

24          and testified as follows:

25                      DIRECT EXAMINATION

# SMF ATTACHMENT "H"

DPS-32(8/2008)

**GEORGIA**
**UNIFORM TRAFFIC CITATION, SUMMONS, ACCUSATION/WARNING**

\* 2 9 2 9 0 3 \*

08090060

SS NR-GA 0670300

292903

Court Case Number          NCIC Number          Citation Number

## CITY OF LAWRENCEVILLE

Upon

| Month | 9 | 24 | 2008 | at | 1348 | ☐ A.M. ☐ P.M. |
| | (Day) | (Year) | | | |

**SECTION I - VIOLATOR**

Operator License No.

License Class or Type _NOT DRIVING_  State _____ Endorsement _____ Expires _____

Name _Jaipersaud_   _Drupathy_   _Napaul_
     (Last)        (First)        (Middle)

Address _1620 Cooper Lakes Dr_

City _Grayson_  State _GA_  Zip Code _30017_

DOB _4/29/71_  Hair _Blk_  Hgt. _503_  Wgt. _118_  Sex _F_  Race _____  Eyes _Bro_

Veh. Yr. _____ Make _____ N/A Style _____ Color _____

Registration No. _____ County _____ Yr. _____ State _____

COMMERCIAL DRIVER LICENSE ☐ YES ☐ NO   COMMERCIAL VEHICLE ☐ YES ☐ NO   ACCIDENT ☐ YES ☐ NO

(ONE VIOLATION PER CITATION)

**SECTION II VIOLATION**

Within the State of Georgia, did commit the following offense:   SPEEDING - Clocked by ☐ VASCAR ☐ LASER ☐ RADAR ☐ PATROL VEHICLE ☐ OTHER

(Serial # _____ Calibration / Check _____ at _____ MPH in a _____ zone

☐ DUI (Test administered: ☐ BLOOD ☐ BREATH ☐ URINE ☐ OTHER)   DUI Test results _____

TEST ADMINISTERED BY (If applicable) _____

OFFENSE (Other than above) _Disorderly Conduct_

In Violation of Code Section _31-101(CXX)_  Lawrenceville; ☐ ☐ State Law ☐ Local Ordinance

REMARKS _Accused Struck Patron while conducting_
_business then refused to cooperate w/ police_

PLACE OF EMPLOYMENT _____

| WEATHER | (A) ROAD (B) | TRAFFIC | LIGHTING | COMMERCIAL VEHICLE INFORMATION |
|---|---|---|---|---|
| ☑ Clear | ☐ Dry  ☐ Concrete | ☐ Light | ☑ Daylight | ☐ Commercial Vehicle Violation |
| ☐ Cloudy | ☐ Wet  ☐ Blacktop | ☐ Medium | ☐ Darkness | |
| ☐ Raining | ☐ Ice  ☐ Dirt | ☐ Heavy | ☐ Other | ☐ Hazardous Materials Violation (PLACARD) |
| ☐ Other | ☐ Other ☐ Other | | | |

**SECTION III LOCATION**

County of _Gwinnett_

on _256_  _Hurricane Shoals_  _____ miles _____ of (city) _Lawrenceville_

at/on (secondary location) _White Trail Lane_  (within city) _Lawrenceville_

OFFICER _Ashley_   Badge # _70_  Div. _CID_
        (Print)

**SECTION IV SUMMONS**

You are hereby ordered to appear in the court indicated below to answer this charge on

(DATE) _Nov. 15_ , _2008_  at (TIME) _9:00_  ☐ AM / PM

See back of citation for mailing address to MUNICIPAL COURT only.
☐ Municipal Court at 70 S. Clayton Street, Lawrenceville, Georgia. (PHONE) 770-963-3288
☐ Superior Court 770-822-8400   ☐ State Court 770-822-8300   ☐ Juvenile Court 770-619-6300
Pay Online at: lawrencevillegatix.com   or   call 800-701-8560

Pursuant to Georgia Code 17-6-11, a drivers license may be displayed to the officer in lieu of bail. SERVICE: This notice shall constitute official service to you that failure to dispose of this citation as outlined above shall be deemed a violation of this code section and shall cause the designated Court in this matter to forward your drivers license number to the Department of Public Safety, and your drivers license shall be placed in suspension. The suspension shall remain in effect until such time as the designated court, in the manner prescribed, notifies the Department of Public Safety of a satisfactory disposition in this matter. (NOTE: If drivers license is not displayed in lieu of bail, Georgia Code 40-5-56 provides for the suspension of the drivers license of a person who fails to respond to a citation to appear before a designated court.)

LICENSE DISPLAYED IN LIEU OF BAIL   ☐ YES   ☐ NO   RELEASED TO _____

SIGNATURE ACKNOWLEDGES SERVICE OF THIS SUMMONS AND RECEIPT OF COPY OF SAME

SIGNATURE _JAI_   PHONE #: _____

**SECTION V OFFICER CERTIFICATION**

**ARRESTING OFFICER CERTIFICATION**

The undersigned has just and reasonable grounds to believe, and does believe, that the person named herein has committed the offense set forth contrary to law.

SIGNATURE _____   Badge # _70_
        Signature of Arresting Officer

AUTHORIZED AND APPROVED PURSUANT TO:
CODE 40-13-1 - D.P.S. REG. 570.19

**ISSUING DEPT. COPY**

Jaipersaud-68

# SMF ATTACHMENT "I"

# CERTIFIED ORIGINAL FILED BY HAND UNDER SEPARATE COVER

IMAGED TO SAN
11-05-2008

IN THE STATE COURT OF GWINNETT COUNTY

STATE OF GEORGIA

| | | |
|---|---|---|
| STATE OF GEORGIA | * | ACCUSATION NO. |
| | * | |
| v. | * | 0 8 D - 0 8 7 3 2 · 6 |
| | * | |
| DRUPATTY  JAIPERSOUD | * | |

## ACCUSATION

### COUNT  1

Rosanna M. Szabo, the Solicitor of the State Court of Gwinnett County, in the name and behalf of the citizens of Georgia, does hereby charge and accuse **DRUPATTY  JAIPERSOUD** with the offense of **DISORDERLY CONDUCT**, for that said Accused, on or about September 24, 2008, in Gwinnett County, Georgia, did unlawfully act in a violent or tumultuous manner, toward another person, whereby such  person was placed in reasonable fear of his or her life, limb, or health, in violation of  O.C.G.A. § 16-11-39(a)(1), contrary to the laws of this State, the good order, peace, and dignity thereof.

### COUNT  2

Rosanna M. Szabo, the Solicitor of the State Court of Gwinnett County, in the name and behalf of the citizens of Georgia, does hereby charge and accuse **DRUPATTY  JAIPERSOUD** with the offense of **SIMPLE BATTERY**, for that said Accused, on or about September 24, 2008, in Gwinnett County, Georgia, did unlawfully intentionally make physical contact of an insulting and provoking nature with LEON NOBLE, in violation of  O.C.G.A. § 16-5-23(a)(1), contrary to the laws of this State, the good order, peace, and dignity thereof.

Solicitor General

TOM LAWLER, CLERK
08 NOV -3  A: 9: 33
FILED IN OFFICE
CLERK STATE COURT
GWINNETT COUNTY, GA

Georgia, Gwinnett County

This is to certify this is a true and correct copy of Accusation as the same appears of record in Gwinnett County State Court.

Given under my official signature and seal of the Court this ___ day of March 2011

Deputy Clerk State Court, Gwinnett County, Ga.

## STATE OF GEORGIA

## THE STATE COURT OF GWINNETT COUNTY

The defendant named herein Waives formal arraignment, and

FILED IN OFFICE
TOM LAWLER
FEB 25 2009
CLERK STATE COURT
GWINNETT COUNTY GEORGIA

### PLEADS:

NOT GUILTY

This _24_ day of _February_ , 20 _09_

Defendant _____

Defendant's Counsel _____ 142259

Solicitor, State Court
Gwinnett County _____

**********************************************

## VERDICT OF THE JURY

We, the jury, find the Defendant:

Count I _NOT GUILTY_        Count VI _____

Count II _NOT GUILTY_       Count VII _____

Count III _____   Count VIII _____

Count IV _____    Count IX _____

Count V _____     Count X _____

This _25_ day of _FEBRUARY_ , 20 _09_

Foreman of the Jury _____

**********************************************

## VERDICT OF THE COURT

The Court finds the Defendant _____

This _____ day of _____ , 20 _____

Presiding Judge _____

# SMF ATTACHMENT "J"

# CERTIFIED ORIGINAL FILED BY HAND UNDER SEPARATE COVER

IN THE STATE COURT OF GWINNETT COUNTY

STATE of GEORGIA

vs.

Drupatty Jaipersoud

CRIMINAL ACTION NO. _____ FINAL DISPOSITION

OFFENSE(s) ① Disorderly Conduct ② Simple Battery

December TERM, 20 08

RACE: _____ SEX: _____ DOB: _____ OTN: _____ DATE OF OFFENSE: 9-24-08

☐ PLEA: | ☑ TRIAL: | ☑ VERDICT: | ☐ OTHER:

☐ NEGOTIATED | ☑ JURY | ☐ GUILTY ON CT(S) | ☐ NOLLE PROS CT(S)

☐ GUILTY ON CT(S) _____ | ☐ BENCH | ☑ NOT GUILTY CT(S) 1, 2 | ☐ DEAD DOCKET CT(S)

☐ NOLO CONTENDERE CT(S) _____ | ☐ FIRST OFFENDER STATUS - SEE SUPPLEMENTAL ORDER ATTACHED.

## MISDEMEANOR SENTENCE

WHEREAS, the defendant has been found guilty of or has entered a plea to the above-stated offense(s), it is ORDERED that the defendant is sentenced to:
☐ Confinement in the Gwinnett County ☐ Jail ☐ Comprehensive Correctional Complex for a period of _____

☐ After service of _____

Credit time served _____ The remainder to be served on ☐ PROBATION ☐ SUSPENSION

☐ The entire sentence of confinement may be served, subject to the conditions set out herein, on ☐ PROBATION ☐ SUSPENSION

☐ Payment of RESTITUTION (see attached order.) ☐ Fine in the amount of $ _____

_____ PLUS applicable surcharges. Pay by: _____

## CONDITIONS OF ☐ PROBATION ☐ SUSPENSION

**GENERAL CONDITIONS**
(1) You must obey all laws and avoid persons of disreputable or harmful character.
(2) You must avoid injurious and vicious habits, especially alcohol and narcotics unless lawfully prescribed.
(3) You must work faithfully and not change your current residence or leave the jurisdiction of the Court without the permission of the Court.
(4) You must report to your Probation Officer as directed and allow your Probation Officer to visit you wherever you are.
(5) You must pay all fines and restitution within the time specified by your Probation Officer.
(6) You must pay a *Probation Supervision Fee* of $35 each month to Professional Probation Services, Inc., the Court's probation services contractor.
(7) You must pay a Crime Victims Compensation Program fee of $9.00 each month.

**SPECIAL CONDITIONS**
(8) ☐ You must perform _____ hours of COMMUNITY SERVICE at the direction of your Probation Officer.
(9) ☐ You must perform _____ days of COMMUNITY SERVICE through the GCCI. REPORT _____
For orientation. You must pay a Supervision Fee of $85 plus a daily fee determined by the program director.
(10) ☐ You must prove your attendance at ☐ Alcoholics Anonymous or ☐ Narcotics Anonymous _____ meetings PER WEEK for _____ consecutive weeks.
(11) ☐ You must prove you attended a state approved school for ☐ State mandated Risk Reduction ☐ Defensive Driving
(12) ☐ You must begin within 30 days and provide proof of your evaluation and treatment for ☐ mental health ☐ substance abuse
To be completed at: ☐ GRN Mental Health Unit ☐ State Approved Program
(13) ☐ You will not use alcohol or narcotics and you must submit to random alcohol / drug screening.
(14) ☐ You must have ☐ NO contact with ☐ NO VIOLENT contact with ☐ Visit the premises of _____
(15) ☐ You must begin within 30 days and provide proof of attendance and completion of:
☐ certified family violence intervention program ☐ anger management ☐ values clarification
(16) ☐ Appear before this Court on _____, at _____ A.M. to prove completion of the terms of this sentence or your inability to comply.
(17) ☐ You must ☐ pay a $25 Publication fee ☐ install ignition interlock ☐ tag forfeiture
(18) ☐ If fines, surcharges, & special conditions of the sentence are met/completed, probation may begin ☐ with non-reporting ☐ terminated _____
(19) ☐ Attend the Victim Impact Panel ☐ scheduled: _____ @6:30 p.m. ☐ as scheduled by probation ☐ Pay program fee.
(20) ☐ Attend the Teen Victim Impact Panel ☐ scheduled _____ @6:30 p.m. ☐ as scheduled by probation, same program fee.
(21) ☐ You must participate in and complete all the requirements of the Gwinnett County DUI Treatment Court Program
(22) ☐ You must attend the Alcohol Awareness Program scheduled: _____
(23) ☐ _____
(24) ☐ _____

The Defendant is further advised that the Court may, at any time, revoke any conditions of this probation and / or discharge the defendant from probation. The Defendant shall be subject to arrest for violation of any condition of probation herein granted. If such probation is revoked, the Court may order the execution of the sentence which was originally imposed, or any portion thereof, in the manner prescribed by law after deducting therefrom the amount of time the Defendant has served on probation.

Defendant was represented by Attorney Ramon Alvarado _____ County, by (Employment) (Appointment)

Court Reporter Linda Archibald _____ Judge [print] Pamela D. South

ORDERED this 25th day of February, 200 9 Judge [sign] _____

☐ By designation

WHITE - Clerk YELLOW - Solicitor PINK - Probation BLUE - Defense Attorney GOLD - Defendant

AOC Fm 18 NCR [30] September 2007

*(stamp)* FILED IN OFFICE / CLERK STATE COURT / GWINNETT COUNTY, GA / 2009 FEB 25 P 2:09 / TOM LAWLER, CLERK

*(stamp)* I certify this to be a true and correct copy which appears of record in Gwinnett County State Court. Given under my official signature and seal of the Court this _____ day of March 2011 / Donna Whitehead / Deputy Clerk State Court, Gwinnett County, Georgia

