IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DRUPATTY JAIPERSAUD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 10-CV-455-JEC |
| vs. | ) | |
| | ) | |
| TIMOTHY R. ASHLEY, in his individual capacity | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF DRUPATTY JAIPERSAUD

I, Drupatty Jaipersaud, make the following statements under penalty of perjury:

1. My name is Drupatty Jaipersaud but I often go by the nickname Ann. The following statements are true and correct and are made on the basis of my personal knowledge.

2. I am 5' 3" tall. I weigh 118 pounds. I have black hair and a fair complexion. I have a petite build.

3. I was born in Guyana, South America and graduated high school in Guyana in 1987.

1

4. I first arrived in the United States in 1988 and have resided in the Atlanta area ever since my arrival to the States.

5. After arriving in the United States, I attended classes at Kao Medical Center in Stone Mountain and then interned at a doctor's office. In or around 2006, I received my national certifications as a clinical medical assistant, phlebotomy technician, EKG technician. I renew these certifications every two years and they are still active.

6. Since graduating Kao Medical, I have held a number of jobs in the service and technology sectors. For as long as I can remember, I have worked at least one job, and more often, two jobs, in order to support myself and my family.

7. Prior to this incident, I had little direct involvement with law enforcement. I have never been a victim of a serious crime. I have never been arrested, charged or convicted of any crime at all, even minor traffic violations.

8. I had always held the law enforcement community in the highest regard and had no reason to distrust law enforcement before this incident.

9. In December 2007, I purchased and became the owner of a Chevron gas station located at 256 Hurricane Shoals Road in Lawrenceville, Georgia. The photographs attached hereto and hereafter referred to as D. Jaipersaud Decl. Exhibits "A", "B" and "C" fairly and accurately depict the interior breezeway area

of the adjoining convenience store; the cash register area which is located in the rear of the store; and the back room within the cash register area in which I kept the store's video surveillance machine, as they had existed at the time of the incident.

10. I knew the previous owner of the gas station and his wife before I took over the gas station from them. They both had a reputation for getting into disputes with customers and for making racist comments.

11. Officers from the Lawrenceville Police Department have responded to calls at the gas station since I became owner. These calls usually involved unruly customers or minor shoplifting. I do not recall the exact details of every such incident.

12. I have been the owner and operator of the Chevron gas station since December 2007. My husband, Arnold Jaipersaud, assists me in running the store on occasion, as does my 19 year-old son, Leslie Narain. I had never owned my own business prior to becoming owner of the Chevron station.

13. My workday at the station begins around 6 a.m. and does not end until around 12 midnight.

14. The gas station consists of 10 individual unleaded gas pumps. Two of these pumps also provide diesel gas.

15. There is a convenience store that is part of the gas station itself, which sells mostly drinks, snacks, lotto tickets, and newspapers. I spend most of my workday at the station inside this convenience store.

16. I have access to a control panel inside the store that allows me to, remotely, shut off any of the gas pumps at the station. This panel was operational and in existence at the time of the incident.

17. My husband and I were working at the gas station on September 24, 2008, the day of the incident. At this time, there was a gas shortage in metro Atlanta and many gas stations had run out of gas, including my own.

18. I made efforts to alert potential customers that the station had no gas by removing the price placards from the station's landmark Chevron sign and sealing the credit card swipe slots on each gas pump with a piece of paper and tape.

19. I did not sell any gas to any customers on the day of the incident, with the exception of diesel gas, which was in limited supply at the station.

20. I was rationing the diesel gas at this time and only allowed each customer to purchase a maximum of $20.00 worth of diesel gas for each visit.

21. Some time during the early afternoon hours on September 24, 2008, a customer bought $20.00 worth of diesel gas from my station. Shortly after this

customer completed his gas purchase, another customer, a black male, drove up to a gas pump and attempted to purchase unleaded gas.

22. At that point, however, the station still had no unleaded gas and the pump this customer sought to use had been turned off. Still, this customer tried to purchase gas.

23. I was watching this customer from inside the store, which has a large display window facing the gas pumps.

24. Unsuccessful in completing his gas purchase, this customer then walked over from his car and entered the store.

25. This customer's initial arrival at the gas station and his subsequent visit to the store was documented by the gas station's surveillance video system. A copy of the surveillance video is attached as SMF Attachment "B" to my Statement of Material Facts.

26. I have reviewed the attached video [SMF Attachment "B"] and it fairly and accurately depicts the gas station, adjoining convenience store, and the events that unfolded on the day of the incident.

27. When this customer, whose name I later found out to be Leon Noble, came into the store, he appeared angry. At that point, both my husband and I were

standing behind the counter. Mr. Noble asked us in an accusatory tone of voice why we had sold gas to another customer but not to him.

28. I responded by explaining to him that the previous customer whom he had seen purchase gas had, in fact, bought diesel gas, and that the station did not have any regular or unleaded gas for sale because of the gas shortage.

29. I don't know if Mr. Noble heard my explanation or not, or simply chose to ignore it. Mr. Noble accused me of being racist. He claimed that I was willing to sell gas to a white customer but not to a black customer.

30. I told Mr. Noble that skin color had nothing to do with it and that the customer who preceded him had, indeed, bought diesel gas.

31. I suggested to Mr. Noble that he go back outside and look at the diesel gas pump, which was clearly marked "diesel only." I mentioned to Mr. Noble that if he wanted to purchase diesel gas, he could do so; otherwise, I had no gas for sale.

32. Mr. Noble still sounded angry from his inability to buy gas or what he perceived was my refusal to sell any of it to him. He cursed at me and called me a "Coolie" which is a racist remark directed at people of Indian descent. I then responded by cursing at him and demanding that he get out of my store.

33. All I wanted to do at this point was to have Mr. Noble leave my store since he was being disruptive and was interfering with my efforts to assist other customers.

34. But Mr. Noble said he would not leave the store until he could buy some gas. Mr. Noble still insisted that he had seen someone else buy gas right when he arrived and that he was going to file a complaint against me because my husband and I were being picky as to who we were selling gas to.

35. At some point, my husband demanded to know why Mr. Noble called me a "coolie." Mr. Noble then cursed at my husband and they began arguing.

36. Mr. Noble challenged my husband to go outside, like he was going to fight my husband. Mr. Noble was about six feet tall with an athletic build and my husband was perhaps a head shorter than him and of a much more petite build.

37. My husband and I followed Mr. Noble to the front door of the store. At this point, I felt angry (because Mr. Noble refused to leave the store) and scared (because Mr. Noble might hurt my husband).

38. My husband and I continued to insist that we had no gas for sale and repeatedly asked Mr. Noble to leave the store.

39. Mr. Noble's wife then ran over from their car toward the store and started yelling at my husband and me. Both she and Mr. Noble were being very aggressive and threatening.

40. I went to the back of the store, in the cash register area, and called 911 for help in dealing with the Nobles. Meanwhile, my husband stayed up front with the Nobles and continued to demand that they leave the store.

41. I do not remember how much time I spent on the phone with the 911 operator before the police arrived on scene. It appeared to be no more than a few minutes, however.

42. I was upset at and scared of both Mr. and Mrs. Noble and stayed mostly behind the counter during the time I was on the phone with the 911 operator.

43. Throughout my encounter with Mr. and Mrs. Noble, I never touched or hit either of them. Nor did I ever use any racial slurs against them. It just seemed like the more my husband and I insisted that the Nobles leave the store, the more aggressive and threatening they became.

44. The Nobles were standing outside of the store when the first police officer arrived. The officer spoke to the Nobles. I could not hear what they were talking about since I was inside the store.

45. Ashley arrived at the gas station shortly after the arrival of the first-responding officer. He also spoke to the Nobles first. At this time, a few other officers had also gotten to the gas station as well.

46. The first-responding officer came into the store after speaking to the Nobles. Without asking me what had happened, he said, in an accusatory tone, that I "had probably called" the male customer "a nigger."

47. I was taken aback by the officer's accusation. I said "excuse me" and asked him how he could accuse me of wrongdoing right off the bat when he hasn't even heard my side of the story.

48. Ashley, who had entered the store and was listening to my conversation with the officer, instructed me not to question the officer. He added that if I was being robbed and someone had a gun to my head, that I would have to depend on them (i.e., the police) for help.

49. I was confused and upset. I could not understand why the police officers were so hostile to my husband and myself. They were treating me like a suspect in my own store. The officers seemed unwilling to find out my side of the story.

50. I told both Officer Cone and Ashley that I did not hit Mr. Noble.

51. I offered to show Ashley the surveillance camera footage taken earlier that day.

52. I told Ashley that I didn't know how to operate the video surveillance machine, nor did my husband. I gave Ashley and another officer the operating manual for the machine, in addition to my password for logging into the machine. This other officer, whose name I do not recall, said he had experience in working different types of video surveillance machines.

53. I showed Ashley and the other officer the room where we kept the video surveillance system. It was located in a small room in the back of the store, behind the counter.

54. I never once told Ashley or the other officer that they were not allowed to access the video surveillance machine. I provided Ashley and the other officer with unlimited access to the video surveillance machine and the room in which it was stored.

55. I went back to helping customers who had come into my store but still tried to assist in the police investigation to the best of my abilities; I had an interest in having the matter resolved as quickly as possible because I knew Mr. Noble did not tell the truth to the officers and because I was worried about the investigation disrupting my customers.

56. After about 10 minutes, Ashley told me they were unable to operate the video surveillance machine. He appeared upset and frustrated.

57. Ashley asked me how I would operate the machine if there were an incident at the store that required viewing the surveillance video. I told him that my son was usually the person who would help in working the machine.

58. Ashley demanded that I get my son to the store "immediately." I told Ashley that my son was in class at Clayton State University and that he doesn't answer his phone while he is in class. I also told Ashley that Clayton State University was over an hour away from the store by car.

59. Ashley still insisted that I get my son to the store immediately. I called my son in Ashley's presence using my cell phone. My son did not answer. I do not remember if I left him a voice mail message or not.

60. My cell phone number at that time was (678) 984-5119; my provider was Sprint.

61. I told Ashley that I had just tried calling my son and that I received no answer from him because he was probably in class.

62. At some point, I told Ashley that he could take the entire video surveillance machine with him to the precinct if he wanted to do so. He declined my offer.

63. At no point did Ashley ever suggest to me or my husband that he would be willing to wait around for my son to arrive, assuming that we could have even made contact with him.

64. Still visibly frustrated, Ashley said, "if you don't get your son to the store immediately, I will arrest you." Ashley was standing a few feet away from me when he said this. He was pointing his finger in my face and speaking to me in an aggressive tone of voice.

65. I asked Ashley what he would arrest me for, and he said for being "uncooperative." I asked Ashley how I was being uncooperative. I also told him that he "could not come into my store and make such unreasonable demands on me."

66. Ashley then grabbed me by my upper arm and pulled me outside the store. My husband followed us outside. He had witnessed the entire exchange between Ashley and myself.

67. Ashley grabbed my arm so hard that he caused it to bruise.

68. I was confused and upset. I felt like it was unreasonable for Ashley to threaten me with arrest and then actually arrest me simply because I could not get my son to the store at his request, especially since my son was at that time attending class and it would take him over an hour to drive to the gas station.

69. Once outside, another officer handcuffed me and placed me in the back of a patrol car but left the door open. No one told me the reason for my arrest. When I asked Ashley why he was arresting me, he said "you will know."

70. I started feeling pain from the handcuffs because they were pressing against some bangles that I had been wearing that day. I mentioned this to the officers on scene but they did nothing about it.

71. While in the back of the patrol car, I felt a strong urge to urinate. I told Ashley that I had to go to the bathroom several times. He ignored my first few requests and only when I told Ashley that I would "wet my skin" did he allow me to use the restroom inside the store.

72. After using the restroom, I was returned to the back of the same patrol car. An officer whose name I do not recall drove me to the Gwinnett County Jail on University Parkway. He was playing very loud music in the car during the entire trip to the jail.

73. I was arrested during broad daylight in front of my store and in full view of customers who were present at that time. I take great pride in running an efficient and customer-friendly business establishment. I felt humiliated and scared as a result of my arrest by Ashley.

74. At no time during the investigation did Ashley say to me that he would be willing to remain at the store until my son returned from school. Instead, he consistently insisted on my son's immediate presence, and threatened me with arrest when I could not make that happen. I felt that Ashley was more interested in quickly ending the investigation than with finding out what really happened that day.

75. Neither Ashley nor any other officer ever returned to the store to view the video. Had they sought to do so, I would have tried to have my son present to assist with operating the video surveillance machine.

76. At no time did I ever curse at Ashley or any other police officer. I never physically interfered with their investigation in any way. I made an effort to be as accommodating as possible to the officers, including Ashley, during their investigation, as did my husband.

77. Brown issued me a citation for Disorderly Conduct. A true and correct copy of this citation is attached as SMF Attachment "H" to my Statement of Material Facts.

78. When I arrived at the jail, I was fingerprinted and photographed during the "book in" process. An officer confiscated all of my personal

belongings. I was then placed in a holding cell with other recent arrestees. I felt nervous and cold.

79. I remained incarcerated at the jail from around 2:00 p.m. on September 24, 2008 until around 11:00 p.m. that same day.

80. I qualified for a "cash bond" in the amount of $406.00. My mother and brother put up money for my bond.

81. I was subjected to criminal prosecution. I hired Ramon Alvarado to defend me. I paid Mr. Alvarado $1,500.00 to represent me.

82. My case was initially prosecuted in Lawrenceville Municipal Court. With the assistance of Mr. Alvarado, the case was bound over to Gwinnett County State Court on or around October 10, 2008.

83. On November 8, 2008, the Solicitor General's office filed an accusation against me. The accusation contained two charges: disorderly conduct and simple battery.

84. On February 24, 2009, I went to trial on these charges. Mr. Alvarado represented me at trial. The first day of trial consisted mostly of jury selection.

85. The trial continued to a second day. Ashley testified on the second day of the trial. Mr. Alvarado also played the surveillance video recorded on September 24, 2008 for the jury.

86. A copy of this same video is attached as SMF Attachment "B" to my Statement of Material Facts. I have reviewed this video and it fairly and accurately depicts my gas station and store, in addition to the events that unfolded during the Sept. 24th incident.

87. The jurors reached a verdict after about an hour of deliberation. They found me "not guilty" on both charges.

88. After the trial ended, Mr. Alvarado and I went to speak with the jurors. Several of them suggested that I pursue a civil action against Ashley for his actions in arresting me that day.

Further Affiant sayeth not. Sworn to under penalty of perjury.

Dated: 3-01-11

_Drupatty Jaipersaud_
Drupatty Jaipersaud